## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

ANTHONY CASTILLO SANCHEZ,          )
                                   )
                  Petitioner,      )
vs.                                )          NO.  CIV-10-1171-HE
                                   )
ANITA TRAMMELL, Warden,            )
OKLAHOMA STATE PENITENTIARY,       )
                                   )
                  Respondent.[1]   )

## MEMORANDUM OPINION

Petitioner, Anthony Castillo Sanchez, a state court prisoner, has filed a petition for a

writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254.  Doc. 25.[2]  Petitioner

challenges the convictions entered against him in Cleveland County District Court Case

No. CF-2000-325.   Tried by a jury in 2006, petitioner was found guilty of first degree

murder, first degree rape, and forcible anal sodomy.   For the rape and sodomy offenses,

petitioner received an aggregate sentence of sixty years imprisonment and a $20,000 fine.

Petitioner was sentenced to death for the murder.   In support of his death sentence, the jury

found three aggravating circumstances:  (1) the murder was especially heinous, atrocious, or

cruel; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest

or prosecution; and (3) the existence of a probability that petitioner would commit criminal

---

[1] *Pursuant to Fed. R. Civ. P. 25(d), Anita Trammell, who currently serves as warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent in this case.*

[2] *Doc. 25 is actually the amended petition.  The amended petition was filed to correct the original petition, Doc. 23, which was inadvertently filed without the signature of counsel.*

acts of violence that would constitute a continuing threat to society (O.R. IV, 790-92; O.R. V, 832-33, 898-902).

Petitioner has presented twelve grounds for relief. Respondent has responded to the petition and petitioner has replied. Docs. 25, 31, 33, and 41. In addition to his petition, petitioner filed motions for the appointment of an investigator, discovery, and an evidentiary hearing. Docs. 16, 24, and 32. All of these motions have previously been denied. Docs. 20, 42, and 43. After a thorough review of the entire state court record (which respondent has provided), the pleadings filed in this case, and the applicable law, the court concludes that petitioner is not entitled to habeas relief.

## I.  Procedural History.

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. Sanchez v. State, 223 P.3d 980 (Okla. Crim. App. 2009), cert. denied, ___ U.S. ___, 131 S.Ct. 326 (2010). Petitioner also filed a post-conviction application, which the OCCA denied in an unpublished opinion. Sanchez v. State, No. PCD-2006-1011 (Okla. Crim. App. Apr. 19, 2010) (unpublished).

## II.  Facts.

In adjudicating petitioner's direct appeal, the OCCA set forth a summary of the presented evidence. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by petitioner, the court finds that petitioner has not done so, and that in any event,

the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

Jewell Jean "Juli" Busken lived in the Dublin West Apartments on East Lindsey Street in Norman, near the University of Oklahoma, where she studied ballet. In the winter of 1996, she had completed her course requirements for graduation. Ms. Busken planned to return to her parent's home in Arkansas and enroll in graduate school. She had packed most of her belongings earlier in the week. Her parents were to arrive in Norman on December 20, 1996, to collect her things in a U–Haul trailer and accompany her back to Arkansas.

Ms. Busken spent the evening of December 19, 1996, visiting with her college friends, exchanging Christmas gifts and goodbyes. She had planned to give her friend, Megan Schreck, a ride to Will Rogers Airport early on the morning of December 20, so the two decided to stay up all night long. Ms. Busken and Ms. Schreck left Schreck's apartment on West Lindsey Street and ate at the Kettle around 2:00 a.m., returning to the apartment around 3:00 a.m. Ms. Busken fell asleep for a short while, and they headed toward the airport around 4:30 a.m. Around 5:00 a.m. on December 20, 1996, Ms. Busken dropped off her friend. She left Will Rogers Airport driving her red Eagle Summit, which bore an Arkansas license plate.

Around 5:30 a.m., back at the Dublin West apartments where Ms. Busken lived, at least three people heard a woman scream in terror. William Alves, a Norman Police officer, lived at the apartments and worked off-duty security. When Alves heard the screaming, he went outside and looked, but saw nothing. Jackie Evans lived across the parking lot from Ms. Busken. She also heard a woman's scream, and a man saying "just shut up and get in the car." Ms. Evans described a car door opening, then closing, the sound of footsteps, and another car door opening and closing. She then heard the car start and quickly drive away. Norman Police officer Kyle Harris arrived at the apartments around 5:51 a.m. in response to a 911 call reporting the screams. He could find nothing suspicious at the apartment.

Ryan James worked with Juli Busken at the OU Golf Course. They were close friends. Mr. James had plans to meet Ms. Busken for lunch on December 20, 1996. When he arrived at Ms. Busken's apartment around 11:00 a.m., he noticed her car was gone. Mr. James returned to work at the golf course. He checked Ms. Busken's apartment again when he got off work around 4 p.m., hoping they would have dinner together, but she still had not

returned home. Mr. James was worried about Ms. Busken and checked with his grandparents to see if she had called or visited their home, as she often did. She had not been there, either. Mr. James and his grandfather searched for Ms. Busken, even driving to Will Rogers Airport trying to find her. Mr. James' grandfather knew OU Police Chief Joe Lester. They contacted Chief Lester early in the evening of December 20, 1996, to report that Ms. Busken was missing. Juli Busken never returned.

Randy Lankford saw something unusual lying along the shoreline of Lake Stanley Draper around noon on December 20, 1996. He may have persuaded himself it wasn't a human body he had seen, but whatever it was still troubled his mind after he returned home. Lankford returned to the lake with his wife after dark that evening. Shining their lights down onto the shore, the Lankfords believed they saw a body lying at the water's edge. They reported the matter to a nearby police station, and police soon descended on the scene to investigate the body and preserve evidence. From the physical description in a Missing Persons report originating from Norman concerning a female student, Oklahoma City police quickly deduced they had found the body of Juli Busken. Chief Joe Lester gave the awful news to Bud and Mary Busken, who had arrived in Norman just a short time before, that the search for their missing daughter was over. A long search for Juli Busken's killer had only begun.

Ms. Busken's body was clothed when she was found, but her jeans were unbuttoned and unzipped, and her underwear was partially rolled down her thighs. She was found lying face down, her head and shoulders in the shallow freezing water, her hands bound behind her with black shoe laces. Her prized opal and diamond ring, a gift from her parents, was missing from her finger and has never been found. Crime scene technicians recovered a possible pubic hair from her stomach when she was turned over. Investigators could see Ms. Busken had been shot in the head.

At the autopsy, the Medical Examiner observed that Ms. Busken's nose and forehead were scratched and bruised, and blood was in her left nostril. Several oval shaped bruises were seen on her inner thigh. She was also bruised in a small area near the labia, and a small scrape was found in the perianal region. Fecal matter was smeared in an area on her buttocks. The Medical Examiner preserved swabs of her oral, vaginal, and anal cavities for DNA analysis. The death wound was a contact gunshot to the rear of the skull, traversing the brain from back to front, left to right, and slightly upward before coming to rest in the frontal area of the skull, causing multiple fractures and

catastrophic brain injury. The Medical Examiner recovered the fatal bullet, later identified by caliber as .22 Long Rifle. Subsequent ballistics analysis showed the barrel of the weapon that fired the fatal bullet marked it with sixteen lands and grooves and a right-hand twist.

Police recovered several items of evidence from the crime scene at Lake Stanley Draper, including a discarded pink leotard bearing the initials "JB," wiped with apparent fecal matter. A tissue smeared with apparent fecal matter was also recovered. Investigators could see two sets of footprints leading to the water's edge, and one set leading away, which they marked and photographed. From multiple cuttings of Ms. Busken's garments, the anal swab obtained from the body, and a pair of pajama bottoms recovered from Ms. Busken's vehicle, criminalists later identified the presence of human spermatozoa. Criminalists eventually used the genetic material recovered from Ms. Busken's panties and the pink "JB" leotard to develop the DNA profile of an unknown suspect.

Sightings of Juli Busken and her abductor reported by other witnesses narrowed the timeframe within which Ms. Busken was kidnapped and killed. Janice Keller saw a small red car like Juli Busken's near Lake Stanley Draper between 6:45 and 7:00 a.m. on the morning of December 20, 1996. Keller saw a young man, she approximated between age twenty-five and thirty, driving the car. In the passenger seat, she could see a woman who seemed somewhat younger, with her hair pulled back and prominent bangs in front. In the young woman's remarkably large eyes and facial expression, Ms. Keller sensed the presence of fear. She also noticed how the male driver looked angry. Ms. Keller contacted police about her sighting after hearing of the Juli Busken murder, but was not interviewed until two years later. She provided police with her own profile drawing of the man she saw, and helped develop a composite drawing admitted at trial.

David Kill was on his way home from a night shift at Tinker Air Force Base, driving back toward Norman that morning around 7:10 to 7:15 a.m. He encountered a red compact car bearing an Arkansas license plate driving away from Lake Stanley Draper. A male driver, alone in the car, cut off Mr. Kill in traffic and seemed not to notice he was there. Mr. Kill was incensed by the man's driving and chased the car back to Norman at high speed. He testified that despite his aggressive pursuit of the car, the driver still seemed oblivious to him. He parted with the red car when he turned on Alameda Street, but watched it continue south toward Lindsey Street. After seeing a news report about Ms. Busken's disappearance, Mr. Kill realized he had seen her car and called Oklahoma City Police. Kill also gave a physical description of the driver

he had seen and helped develop a composite drawing, also admitted as evidence.

Late in the evening of December 20, 1996, OU Police found Juli Busken's red Eagle Summit parked just across the street from the Dublin West Apartments, where the screams were heard early that morning. A pair of pajama bottoms recovered from the car were stained with semen, from which criminalists later isolated a sperm fraction and developed a partial DNA profile. Police also photographed an impression of a person's buttocks imprinted on the exterior panel of the car. A cell phone, a CD player, and a radar detector were missing from the car. Records of activity on Ms. Busken's missing cell phone showed that a call was placed on December 21, 1996, to a number investigators later associated with [petitioner's] former girlfriend. Calls were also placed from Ms. Busken's phone after her murder to two numbers (both in the form 447–68xx) similar to phone numbers later associated with friends of [petitioner].

In 2000, the State of Oklahoma charged an unknown suspect with the kidnapping, sexual assault, and murder of Juli Busken, identifying the defendant only by the DNA profile developed from crime scene evidence. In the months and years after her murder, investigators contacted and interviewed virtually every person they could find who had ever known, or might have had reason or opportunity to harm, Juli Busken. Detectives asked for DNA samples from almost 200 people to compare against the suspect DNA profile and other serology evidence. Throughout the entire investigation, prior to July, 2004, [petitioner] was never interviewed, contacted, or considered a suspect in Ms. Busken's murder. Indeed, Ms. Busken's closest friends testified at trial they had never seen or heard of [petitioner] as a friend or acquaintance of Juli Busken.

[Petitioner] went to prison in 2002 for a second degree burglary committed the previous year. While serving his sentence, the Oklahoma Department of Corrections obtained his tissue sample for DNA analysis, as required by statute. The Oklahoma State Bureau of Investigation (OSBI) then developed a DNA profile from the sample and placed it into the OSBI's Combined DNA Index System (CODIS). In July, 2004, OSBI Criminalist Ken Neeland notified a cold case detective in the Oklahoma City Police Department that [petitioner's] DNA profile had generated a hit on the unknown DNA profile associated with the Juli Busken murder.

Police obtained a search warrant and a new sample of [petitioner's] DNA for further comparisons. The State presented evidence at trial that [petitioner's] DNA matched the DNA profile generated from the sperm cell fraction isolated on Ms. Busken's panties; and also matched the sperm cell fraction isolated from the stained pink leotard discarded at the crime scene. The matches corresponded to [petitioner's] known DNA at all sixteen genetic loci tested. The State's DNA expert characterized the probability of a random DNA match on the Busken evidence with an unrelated individual other than [petitioner] as 1 in 200.7 trillion Caucasians, 1 in 20.45 quadrillion African Americans, and 1 in 94.07 trillion Southwest Hispanics. [Petitioner] also could not be excluded as the donor of a DNA mixture isolated from epithelial cell fractions on the panties and leotard. DNA comparisons on the spermatozoa recovered from the anal swab and the pajama bottoms from the car were inconclusive.

[Petitioner's] former girlfriend, Christin Setzer, testified that between 1994 and 1996 she lived with [petitioner] in a residence on Drake Drive in southeast Norman, about one mile from Juli Busken's apartment. Ms. Setzer and [petitioner] had a child in May, 1997, but later separated. When police interviewed Ms. Setzer years after the Busken murder, she described an incident when shots were fired within the Drake Drive residence. Only [petitioner] and his step-father [sic] were in the room where shots were fired. Ms. Setzer told police she later saw bullet holes in the east wall of the room. Police obtained a search warrant for the residence in 2004, and dismantled the walls looking for evidence of these shots and any potential projectiles. They located a linear defect in the lumber of a wall stud consistent with a bullet strike, but were unable to find a projectile. Police also found a piece of foam which bore marks consistent with a bullet strike. After police collected these items and left the scene, the owner of the residence vacuumed the area of the wall which police had dismantled. Searching the contents of the vacuum bag later in his garage, he located an item later identified as a .22 Long Rifle projectile. The Drake Drive bullet was marked ballistically with sixteen lands and grooves and a right-hand twist, and thus shared the same caliber and general barrel markings as the .22 bullet that killed Juli Busken. Testimony from one of [petitioner's] friends established that [petitioner] was in possession of a small .25 caliber pistol in 1994 and 1995. The State impeached this witness with his prior statement that the pistol could have been a .22 or .25 caliber. Attempts to positively identify the Drake Drive bullet and the bullet recovered from Juli Busken as being fired from the same weapon proved inconclusive.

Sanchez, 223 P.3d at 987-90.

## III.  Standard of Review.

### A.  Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B.  Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

## C.    Merits.

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the court's authority to grant habeas corpus relief to state prisoners is limited.  When a state prisoner presents a claim to this court, the merits of which have been addressed in state court proceedings, the court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II).  See Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011) (acknowledging that Section 2254(d) places a difficult burden of proof on the petitioner). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded

jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Harrington v. Richter</u>, 562 U.S. 86, ___, 131 S.Ct. 770, 786 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Id.</u> The deference embodied in "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> (citation omitted).

## IV. Analysis.

### A. Ground I: Sufficiency of the Evidence.

In his first ground for relief, petitioner contends that none of his convictions are supported by constitutionally sufficient evidence. On direct appeal, petitioner presented sufficiency challenges to his convictions for murder and rape. The OCCA addressed the merits of these challenges and denied relief. <u>Sanchez</u>, 223 P.3d at 1002-03. Petitioner acknowledges that he has never pursued a state court sufficiency challenge to his sodomy conviction. Reply, pp. 1, 4-6. Respondent asserts that petitioner's first ground should be denied because petitioner has not shown that the OCCA's decision on direct appeal is contrary to or an unreasonable application of <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). Respondent additionally asserts that petitioner's challenge to his sodomy conviction should be procedurally barred.

<u>Jackson</u> sets forth the familiar standard of review for sufficiency of the evidence claims: "the relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319. As the <u>Jackson</u> Court noted,

> [t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

<u>Id.</u> (footnotes omitted). Judicial review, therefore, is "'sharply limited'" and a reviewing court "must accept the jury's determination as long as it is within the bounds of reason." <u>Boltz v. Mullin</u>, 415 F.3d 1215, 1232 (10th Cir. 2005) (citations omitted). "[T]he <u>Jackson</u> inquiry does not focus on whether the trier of fact made the *correct* guilt . . . determination, but rather whether it made a *rational* decision to convict . . . ." <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993). <u>See also</u> <u>Jackson</u>, 443 U.S. at 318-19 (the question is not whether the reviewing court itself believes that the evidence is sufficient to establish a defendant's guilt beyond reasonable doubt). Thus, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326.

In addition to the deference afforded a jury's verdict by <u>Jackson</u>, the AEDPA adds another layer of deference to the court's review of a sufficiency claim.

The opinion of the Court in <u>Jackson</u> . . . makes clear that it is the responsibility of the jury–not the court–to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

<u>Cavazos v. Smith</u>, 565 U.S. ___, 132 S.Ct. 2, 3-4 (2011) (per curiam) (citation omitted). <u>See also</u> <u>Parker v. Matthews</u>, 567 U.S. ___, 132 S.Ct. 2148, 2152 (2012) (referring to habeas review of sufficiency claims as a "twice-deferential standard"); <u>Coleman v. Johnson</u>, 566 U.S. ___, 132 S.Ct. 2060, 2062 (2012) (per curiam) (noting that <u>Jackson</u> claims "are subject to two layers of judicial deference").

In denying petitioner relief on direct appeal, the OCCA applied the <u>Jackson</u> standard and found that "[t]he evidence presented at trial tends to show that [petitioner] forced Ms. Busken into her own car around 5:30 a.m., sexually assaulted her in an unknown location, and murdered her on the shoreline of Lake Stanley Draper around 7:00 a.m on December 20, 1996." <u>Sanchez</u>, 223 P.3d at 1002. In response to petitioner's contention that the presented evidence did not place him "at the scene of the murder or in Ms. Busken's car[,]" the OCCA noted at least "[t]hree strands of evidence [which] contradict[ed] [petitioner's] major premise . . . ."

First, [petitioner's] DNA matched the unknown DNA isolated from sperm fractions recovered from Ms. Busken's panties, and the unknown DNA from the pink leotard found discarded at the crime scene. Police also identified human sperm from stains found on pajama bottoms recovered from Ms. Busken's car. These facts permit the logical inference that the sperm on

the pajama bottoms in Ms. Busken's car is also [petitioner's], despite inconclusive DNA results on the pajama bottoms. Second, records of activity on Ms. Busken's missing cell phone show a call placed to a number which investigators eventually associated with [petitioner's] former girlfriend, over thirty hours *after* the Busken murder. The logical inference is that [petitioner] was in possession of Ms. Busken's phone, and he got the phone from her car, where she usually left it. Finally, the shoe impressions . . . [at the scene were] consistent with a pair of Nike shoes owned by [petitioner], [and] tend to establish his presence where Ms. Busken was murdered. This direct and circumstantial evidence is sufficient to support the jury's finding that [petitioner] sexually assaulted and murdered Juli Busken.

Id.

"DNA testing has an unparalleled ability . . . to identify the guilty." District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 55 (2009). "It is now often possible to determine whether a biological tissue matches a suspect with near certainty." Id. at 62. In the present case, petitioner was connected to Ms. Busken's murder through a near certain match of his DNA to sperm cells found in the panties Ms. Busken was wearing when her body was found and in her ballet leotard which was found at the crime scene as well. Of the sixteen genetic loci tested, petitioner's DNA matched at every one (State's Exhibit 106). "The State's DNA expert characterized the probability of a random DNA match on the Busken evidence with an unrelated individual other than [petitioner] as 1 in 200.7 trillion Caucasians, 1 in 20.45 quadrillion African Americans, and 1 in 94.07 trillion Southwest Hispanics." Sanchez, 223 P.3d at 989-90.

Despite the strength of the DNA evidence, petitioner argues that the state's evidence fails to show that he was the perpetrator. Petitioner argues alleged weaknesses in the presented evidence, and he downplays the "[p]urported corroborating evidence" found by the

OCCA. Petitioner even implicates his own father by claiming that the composite drawings prepared by the police in the course of the investigation look more like his father than him. Petition, pp. 6-12. In response to these arguments, respondent contends that petitioner completely ignores the highly deferential posture this court must take in reviewing a sufficiency of the evidence claim. Applying the mandated double deference, Jackson deference to the jury's determination and AEDPA deference to the OCCA's direct appeal decision, respondent asserts that petitioner's sufficiency challenges to his murder and rape convictions must be denied. The court agrees.

In addition to the DNA evidence, the OCCA specifically found that petitioner was connected to Ms. Busken through two additional strands of evidence. Sanchez, 223 P.3d at 1002. One involved Ms. Busken's cell phone. When the police recovered Ms. Busken's car, her cell phone was missing. A day after her murder, Ms. Busken's cell phone was used to call a number associated with one of petitioner's ex-girlfriends (J. Tr. XI, 2660-61; State's Exhibits 120 and 141). Id. at 989, 1002.[3] Second, shoeprints were left by the perpetrator at the crime scene. Id. at 1002. With respect to this evidence, the OCCA noted as follows:

> Investigators observed and photographed two pairs of shoe prints in the soil leading to where Juli Busken's body was found. One pair of shoe prints

---

[3] *Petitioner incorrectly faults the OCCA for misstating the evidence regarding this call. Petition, pp. 3, 10. The record clearly shows that Ms. Busken's phone was used after her death to call 447-6120 and evidence was presented that this number was associated with Melanie Crain, one of petitioner's ex-girlfriends. In addition to this call, evidence was also presented that another call was placed from Ms. Busken's cell phone after her death to the number 447-6852. Although this number belonged to Robert Bonner, a man who did not know petitioner or Ms. Busken, the evidence showed that petitioner had two friends with similar numbers, Michelle Beyer, 447-6883, and Dale Spurlin, 447-6807 (J. Tr. XI, 2615, 2617, 2660-61; State's Exhibits 120 and 141).*

correlated to hiking boots worn by Ms. Busken. The other pair of shoe prints led down to the killing scene and then back toward the road. Police compared photographs of these prints to a variety of shoes and came to believe the soles were similar to the Nike *Air Max 2*. Photographs of the questioned shoe print were admitted at trial, along with inked imprints and acetate overlays of the Nike *Air Max 2* shoes provided by the Nike Corporation. The State then presented testimony from [petitioner's] ex-girlfriend, Christin Setzer, who read to the jury an October 14, 1996, entry from her personal calendar indicating that she and [petitioner] had purchased matching Nike shoes that day.

Id. at 999-1000.

Beyond the evidence of petitioner's DNA, the use of Ms. Busken's cell phone after her death, and the shoeprints found at the scene, the jury received additional circumstantial evidence as well. As detailed by the OCCA in its determination of the facts, the state also presented evidence that (1) petitioner lived within a mile of Ms. Busken's apartment (and within a mile of where her car[4] was found), id. at 989, 990; (2) when Ms. Busken was abducted around 5:30 a.m., only one man's voice was heard telling her to shut up and get in the car, and the sounds of the car doors opening and closing indicated that Ms. Busken had only one abductor, id. at 987; (3) between 6:45 and 7:00 a.m., a man was seen driving Ms. Busken's car with Ms. Busken in the passenger seat near Lake Stanley Draper, id. at 988-89; (4) around 7:15 a.m., a man was seen driving Ms. Busken's car away from Lake Stanley Draper, id. at 989; and (5) a .22 Long Rifle bullet, with sixteen lands and grooves and a right-hand twist, was recovered from Ms. Busken's skull, and a bullet with these same

---

[4] *On the driver's side floorboard, there was reddish dirt and sand, which was not found anywhere else in the car's interior (J. Tr. IX, 2261).*

characteristics was found at the residence petitioner occupied at the time of Ms. Busken's murder, id. at 990.[5]

From all of the presented evidence, the court concludes that the OCCA did not act unreasonably with respect to its application of Jackson and its upholding of the jury's determinations of guilt with respect to petitioner's convictions for murder and rape. While petitioner seeks to minimize the relevance of the presence of his semen in Ms. Busken's panties and on her ballet leotard, this evidence was more than just evidence of association with Ms. Busken.[6] As Ms. Busken's closest friends testified, Ms. Busken had no relationship

---

[5] *The state also presented evidence that petitioner possessed a small caliber pistol in the year or two prior to the murder. There was a question as to whether the pistol was a .22 or a .25 caliber. Sanchez, 223 P.3d at 990.*

[6] *In arguing that his contact with Ms. Busken is insufficient to support his convictions, petitioner compares his case to three other cases where the evidence was found constitutionally insufficient. Petition, pp. 12-19. None of these cases are persuasive. The first case, Sanders/Miller v. Logan, 710 F.2d 645 (10th Cir. 1983), is not only a pre-AEDPA case, but its facts concern the criminal liability of the driver of a car when her co-defendant shot and killed the convenience store clerk in the commission of a robbery. In that case, because the driver was not charged with felony murder but with premeditated murder, the court found the evidence insufficient to support her conviction. The other two cases, United States v. Bonner, 648 F.3d 209 (4th Cir. 2011), and O'Laughlin v. O'Brien, 568 F.3d 287 (1st Cir. 2009), are somewhat relevant, but clearly distinguishable. In Bonner, a Subway restaurant was robbed by two concealed assailants. After the robbery, Bonner's wallet was found in the alleged getaway car along with a hat which was worn by one of the robbers. The hat had multiple DNA matches, one of which was Bonner; however, scientific analysis could not show who last wore the hat. Applying de novo review, Bonner's convictions were overturned due to insufficient identity evidence placing him at the scene of the robbery. In O'Laughlin, the victim was brutally beaten resulting in an extensive amount of blood at the scene. In finding a lack of evidence supporting O'Laughlin's convictions, the court noted the lack of physical or DNA evidence linking him to the crimes. "Considering the large amount of blood, it is difficult to fathom how O'Laughlin was able to avoid having any blood or other DNA evidence connect him to [the victim]." O'Laughlin, 568 F.3d at 304. As discussed herein, unlike Bonner and O'Laughlin, petitioner was connected to the crimes against Ms. Busken by strong identity evidence–his semen in her panties.*

with petitioner as a friend, an acquaintance, or otherwise. <u>Sanchez</u>, 223 P.3d at 989. Yet, the presence of his semen clearly shows that he[7] had intimate contact with her.[8] The evidence also supports the conclusion that the crimes against Ms. Busken were committed by a sole perpetrator. In addition to the sounds heard at the apartment complex and the reddish dirt and sand appearing only on the driver's side floorboard, Ms. Busken was seen being driven by a man who made no attempt to conceal his identity. The jury could have rationally determined that after sexually assaulting her, petitioner killed Ms. Busken to prevent her from identifying him. Then, after the murder, the fact that Ms. Busken's cell phone was used to call petitioner's ex-girlfriend is more than just a coincidence. All of this evidence–the DNA, the cell phone usage, the shoeprints, the bullets, and the sole perpetrator evidence–clearly supports the jury's verdicts and the OCCA's denial of relief with respect to petitioner's murder and rape convictions.

Regarding his sodomy conviction, if petitioner were to return to state court to exhaust this claim now, there is no doubt that it would be procedurally barred due to petitioner's failure to raise it on direct appeal or in his first post-conviction application. Nevertheless, the court finds that this claim is more easily disposed of on the merits. <u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

---

[7] *The state's DNA expert testified that petitioner's DNA would be a combination of his parents' DNA. Thus, while petitioner and his father would have common alleles, their DNA would not be the same (J. Tr. XII, 2750-51).*

[8] *Petitioner has never claimed to have a relationship with Ms. Busken nor has he offered any explanation as to why his semen was present at the crime scene.*

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Snow v. Sirmons, 474 F.3d 693, 717 (10th Cir. 2007) ("We can avoid deciding procedural bar questions where claims can readily be dismissed on the merits."). Petitioner's challenges here to the sufficiency of the evidence to support his convictions are all based on a single premise–that the evidence did not show that he was the perpetrator. For the reasons set forth above, the court finds that petitioner has not shown that his sodomy conviction lacks constitutional support. The same evidence that supports his convictions for murder and rape is applicable to the sodomy conviction. Based on the presented evidence, viewed in light most favorable to the state, the court concludes that "*any* rational trier of fact could have found the essential elements of [sodomy] beyond a reasonable doubt." Jackson, 443 U.S. at 319. Accordingly, petitioner's Ground I is denied in its entirety.

## B. Ground II: Voir Dire.

In Ground II, petitioner claims that he was denied his right to "a full and fair examination of prospective jurors regarding their opinions on the death penalty." Petition, p. 21. Petitioner raised this claim on direct appeal, but the OCCA denied relief. Sanchez, 223 P.3d at 995-97. Claiming that the OCCA's determination is contrary to or an unreasonable application of the Supreme Court's decisions in Morgan v. Illinois, 504 U.S. 719 (1992), and Wainwright v. Witt, 469 U.S. 412 (1985),[9] petitioner asserts that he is

---

[9] *Citing general Supreme Court authority, petitioner additionally contends that he was denied the "heightened reliability" afforded a capital defendant. Petition, p. 29 (citing Lockett v. Ohio, 438 U.S. 586 (1978); Reply, p. 10 (citing Woodson v. North Carolina, 428 U.S. 280 (1976)). Because both Morgan and Wainwright specifically address a capital defendant's right to an impartial jury, the concept of heightened reliability is inherently subsumed therein, and the court*

entitled to relief. In light of the deference afforded the OCCA's decision, respondent contends that relief must be denied.

"Capital defendants have the right to be sentenced by an impartial jury." <u>Uttecht v. Brown</u>, 551 U.S. 1, 22 (2007). "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." <u>Morgan</u>, 504 U.S. at 727. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." <u>Id.</u> at 729. <u>See</u> <u>Wilson v. Sirmons</u>, 536 F.3d 1064, 1098 (10th Cir. 2008) (citing <u>Morgan</u>).

An impartial juror in the capital setting is one who, despite his or her views on capital punishment, can follow the trial court's instructions. Therefore, if a "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and his oath[,]" he should be removed for cause. <u>Wainwright</u>, 469 U.S. at 424 (internal citations omitted). "Any juror who states that he or she will automatically vote for the death penalty . . . is announcing an intention not to follow the instructions" and is unqualified to serve on a capital jury. <u>Morgan</u>, 504 U.S. at 738.

The crux of petitioner's complaint is how the trial court responded to confusion expressed by some of the prospective jurors to the question regarding whether they would

---

*need not address this additional contention separately.*

automatically impose the death penalty.[10]  Petitioner contends that the trial court's attempts

at clarification "only made matters worse."  Petition, p. 27.  Asserting that the trial court's

follow-up questions were both "inadequate and misleading," id. at 29, petitioner argues that

"the trial judge improperly steered prospective jurors away from candor," which resulted in

"a tribunal 'uncommonly willing to condemn [[him]] to die. . . .'" Id. at 28 (quoting

Witherspoon v. Illinois, 391 U.S. 510, 518, 521 (1968)).

In denying petitioner relief, the OCCA first noted the circumstances related to

petitioner's claim.

> Prior to jury selection, prospective jurors filled out extensive questionnaires
> and returned them to the Court. Counsel had the benefit of these questionnaires
> when conducting individual *voir dire*. The District Court permitted individual,
> sequestered *voir dire* with every prospective juror, followed by a general *voir
> dire* examination in open court. The entire jury selection in this case consumed
> several days of court time and the first 1,600 pages of trial transcript. The State
> exercised eight peremptory challenges against prospective jurors and waived
> its ninth. [Petitioner] exercised nine peremptory challenges against prospective
> jurors. The parties each exercised one peremptory challenge against the
> prospective alternates. [Petitioner] did not request additional peremptory
> challenges when his nine were exhausted, nor did he allege that he was forced,
> over objection, to keep an unacceptable juror.

Sanchez, 223 P.3d at 995.  Then, after setting forth a painstaking review of the process

employed by the trial court, the OCCA held as follows:

> A review of the entire *voir dire* shows that the District Court could
> readily distinguish between the prospective jurors who were initially befuddled
> by the automatic death penalty question and those irrevocably committed to

---

[10] *The automatic death penalty question asks, "If you find beyond a reasonable doubt that
the defendant is guilty of murder in the first degree, will you automatically impose the penalty of
death?"*  Sanchez, *223 P.3d at 995.*

20

imposing the death penalty for murder. The District Court properly disqualified several prospective jurors who would automatically impose a death sentence in the event of a first degree murder conviction. The District Court also permitted additional, individual *voir dire* by counsel on these subjects. These *voir dire* questions cast additional light on prospective jurors' attitudes about capital punishment. The prosecutor quizzed jurors about how they would vote in a death penalty referendum. Defense counsel's questions ensured that prospective jurors understood no particular punishment was favored by the law more than another. On the whole, *voir dire* provided the Court and counsel with a wealth of information about prospective jurors' attitudes on the issue of capital punishment.

The purpose of *voir dire* examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. The manner and extent of *voir dire* lies within the District Court's discretion. The District Court may properly restrict questions that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury. There is no abuse of discretion as long as the *voir dire* examination affords the defendant a jury free of outside influence, bias or personal interest. Young v. State, 2000 OK CR 17, ¶ 19, 12 P.3d 20, 31–32 (and cases cited). A prospective capital juror should be excused for cause when the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Due process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed to a particular punishment before the trial begins. Hain v. State, 1996 OK CR 26, ¶ 21, 919 P.2d 1130, 1138. Morgan v. Illinois, supra, thus guarantees a capital defendant's right to inquire whether a prospective juror is irrevocably committed to imposing a death sentence.

While this case shows that the questions put to prospective jurors in a death penalty *voir dire* can be confusing to laypersons, the District Court's careful and repeated inquiries about each juror's qualifications sufficiently protected [petitioner's] rights to identify unqualified jurors and intelligently exercise peremptory challenges. Somewhat contrary to [petitioner's] suggestions on appeal, defense counsel at trial remarked that when a prospective juror's contradictory responses to the automatic death penalty question suggested a misunderstanding, "[t]he Court has, upon further inquiry, *cleared up any of the confusion*." (emphasis added). That is a fair assessment of the proceedings before us. Further, [petitioner] sought no additional

peremptory challenges and identified no juror on the final panel who was unacceptable to him, and thus cannot show prejudice from the District Court's alleged errors. <u>Gilbert v. State</u>, 1997 OK CR 71, ¶ 32, 951 P.2d 98, 109. No relief is warranted.

<u>Sanchez</u>, 223 P.3d at 997.

The court concludes that petitioner has not shown that this decision by the OCCA is contrary to or an unreasonable application of Supreme Court law, especially in light of the AEDPA deference that this court must afford it. In denying petitioner relief, the OCCA expressly applied both <u>Morgan</u> and <u>Wainwright</u>. It clearly acknowledged the appropriate standard for who qualifies as an acceptable capital juror, as well as petitioner's right to inquire of prospective jurors in order to assess their ability to serve. Although petitioner faults the trial court's efforts and use of follow-up questions to clear up any confusion a prospective juror may have had, it was not unreasonable for the OCCA to defer to the trial court on this issue. "[B]ecause determinations of juror bias cannot be reduced to question-and-answer sessions[,]" the printed record cannot fully capture the qualification assessment. <u>Wainwright</u>, 469 U.S. at 424-26, 434-35. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." <u>Uttecht</u>, 551 U.S. at 9.

In addition, the court is in agreement with the OCCA that even if the trial court's best efforts fell short in some respects, petitioner has not shown that he was denied his right to an impartial jury. Unlike the circumstances in <u>Witherspoon</u>, petitioner cannot show that his jury

pool was "[c]ulled of all who harbor[ed] doubts about the wisdom of capital punishment–of all who would be reluctant to pronounce the extreme penalty" or that his jury was "organized to return a verdict of death." <u>Witherspoon</u>, 391 U.S. at 520, 521. Of the twelve jurors who actually sat on petitioner's jury and decided petitioner's punishment,[11] the record reflects as follows:

- Two-thirds (Wright, Webb, Parish, Masopust, McLaughlin, Davis, Causey, and Rakestraw) exhibited absolutely no confusion about the automatic death penalty question and stated that they could consider all three punishment options. Four of these jurors (McLaughlin, Davis, Causey, and Rakestraw) also specifically affirmed that they could consider a sentence less than death (J. Tr. I, 52-53, 148-49; J. Tr. II, 349-50, 366-67, 488-89; J. Tr. III, 735-36, 987-88; J. Tr. V, 1452-54);

- Two of the jurors responded to the automatic death penalty question with a question. One (Deering) said, "Automatically?" and the other (Byers) said, "Repeat that?" After the trial judge answered affirmatively to the first question and repeated the question to the second, both stated that they would not automatically impose the death penalty. Both of these jurors also stated that they could consider all three punishments and that they could consider a sentence less than death (J. Tr. II, 433-34; J. Tr. III, 814-15);

- One juror (Helzer) responded to the automatic death penalty question by saying that she did not believe she could give an honest answer. When the trial court followed up with a question about whether she could consider a punishment less than death, the juror responded affirmatively. Responding to follow-up questions by both the prosecution and the defense, this juror affirmed that she would "[d]efinitely consider all three [punishment options] and listen to the facts," that she understood that the issue of punishment was an individual decision, and that she was a "very strong-willed" person who

---

[11] *Two of the jurors who were originally empaneled, Gates and Nowak, were removed and replaced with two alternate jurors, Fleener and Byers, during first stage proceedings (J. Tr. X, 2426-29, 2471-94).*

would stand up for what she believed was an appropriate punishment (J. Tr. II, 379, 381, 386); and

- One juror (Fleener) verbally analyzed her way through the automatic death penalty question as follows: "Because of murder in the first degree? I mean, you can't do that, can you? Don't you have to do it based on - - no, you couldn't - - I would say no." This juror also stated that she could consider all three punishments and that she could consider a sentence less than death (J. Tr. III, 782-83).

Under these circumstances, it was not unreasonable for the OCCA to conclude that petitioner was not prejudiced by the jury selection process. The record supports a conclusion that petitioner's jury consisted of jurors who met the Wainwright standard for qualification. Wainwright, 469 U.S. at 424. For this reason, and the additional reasons set forth above, the court concludes petitioner is not entitled to relief on his second ground for relief.

**C.      Ground III:  Leg Irons Worn By Petitioner During Trial.**

In his third ground for relief, petitioner asserts that his due process rights were violated because he was required to wear leg irons during his trial. Petitioner raised this claim on direct appeal. After directing the trial court to hold an evidentiary hearing on the issue, the OCCA denied relief. Sanchez, 223 P.3d at 990-95. Respondent asserts that petitioner is not entitled to relief because he has failed to show that the OCCA's decision is contrary to or an unreasonable application of Deck v. Missouri, 544 U.S. 622 (2005).

From the evidentiary hearing conducted by the trial court, the OCCA made the following determinations of fact:

> Counsel for the parties stipulated . . . that [petitioner] wore leg irons around his ankles during proceedings before the jury. [Petitioner] testified at the hearing that he was also handcuffed during the jury trial, but these claims were vague, self-serving, and contradicted by the remaining evidence. [Petitioner's] restraints were obscured from the jury's view during individual *voir dire* by seating [petitioner] at the end of a table in the Court's chambers. During proceedings in open court, [petitioner's] leg irons were concealed from the jury by the placement of identical black curtains around the prosecution and defense tables. Testimony established that [petitioner's] movements to and from the courtroom occurred outside the presence of jurors. A deputy testified that every effort was made to conceal [petitioner's] restraints from jurors at all times. The members of the trial jury each testified that they were unaware that [petitioner] was wearing any form of restraints during the trial. Most of the jurors saw the curtains at the tables, but thought nothing of the matter.

Sanchez, 223 P.3d at 991. Although the OCCA found that petitioner's restraints violated a state statute prohibiting a defendant from being "'*tried before a jury while in chains or shackles*,'" id. at 990 (quoting Okla. Stat. tit. 22, § 15 (2001)), the OCCA ultimately concluded that because the leg irons were not visible, petitioner was not entitled to relief.

> In this case, the District Court certainly encouraged [petitioner] to wear a shock sleeve under his clothing. [Petitioner] refused the shock sleeve, believing it would prevent his concentration on the trial. [Petitioner] was subjected to restraint by leg irons throughout the trial. The evidence before us is that every precaution was taken to conceal his restraints from jurors; and no trial juror actually viewed him in restraints. We do not condone the District Court's error in ordering [petitioner] restrained in violation of section 15, and such restraint will not be permitted without a proper factual record in the future. However, [petitioner] has not shown how the District Court's error had any substantial influence on the outcome at trial.

Id. at 995.

In Deck, 544 U.S. at 624, the Supreme Court addressed "whether shackling a convicted offender during the penalty phase of a capital case violates the Federal Constitution." It concluded as follows:

> [T]he Constitution forbids the use of *visible* shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is "justified by an essential state interest"—such as the interest in courtroom security—specific to the defendant on trial. Holbrook v. Flynn, 475 U.S. 560, 568–569, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); see also Illinois v. Allen, 397 U.S. 337, 343–344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

Deck, 544 U.S. at 624 (first emphasis added). Therefore, if a defendant is ordered to wear visible shackles in front of the jury without demonstrated justification, Deck holds that he can obtain relief without a showing of actual prejudice. However, relief may nevertheless be denied if the state can demonstrate that the error was harmless under Chapman v. California, 386 U.S. 18, 24 (1976). Deck, 544 U.S. at 635.

The court agrees with respondent that the OCCA's decision is not contrary to or an unreasonable application of Deck because petitioner's leg irons were not visible. "As Deck makes clear, it is the potential impact on the jury of *visible* restraints that implicates the fundamental fairness of a jury trial proceeding." Ochoa v. Workman, 669 F.3d 1130, 1145 (10th Cir. 2012) (emphasis added). In Ochoa, the Tenth Circuit denied habeas relief where the shock sleeve worn by the petitioner during trial was not visible to the jury. Id. at 1145-46.

Despite the evidence received at the state court evidentiary hearing, which overwhelmingly supports the OCCA's determination that jurors never saw petitioner's leg irons, petitioner nevertheless argues that he is entitled to relief because one juror *assumed* that he was restrained. Petition, p. 35. See also Reply, p. 13 ("It is the perception of shackling that matters most."). Petitioner additionally asserts that if he were given the ability

to further develop this claim,[12] he could explore, among other things, whether other jurors *assumed* he was shackled and whether the shackles affected his relationship with his trial counsel. Petition, pp. 36-37; Reply, pp. 13-15. These arguments are not well-taken. First and foremost, petitioner was granted an evidentiary hearing on this claim in state court. At that hearing, twelve jurors and an alternate juror were questioned individually, and each one of them testified that they were not aware that petitioner had leg restraints–that they did not see him in leg restraints nor did they hear any noise from the leg restraints (E.H. Tr. 5/18/09, 10-37). Because Deck concerns visible restraints, the testimony received at the evidentiary hearing precludes Deck relief, and it is simply irrelevant whether some of the jurors *assumed* that he *might have been* restrained during trial. Regarding petitioner's suggestion that the leg irons might have interfered with his attorney-client relationship, the record lacks even a hint that the leg irons affected his representation. Although petitioner did advise the trial court that he was dissatisfied with his attorneys, he never asserted that the leg irons were the cause of their strained relationship (J. Tr. I, 36-46; S. Tr. 6/6/06, 8). In addition, in his arguments to this court, petitioner has done nothing more than question that the two might have been related. For these reasons, petitioner's arguments do not make out a basis for concluding that the OCCA acted unreasonably in denying petitioner relief, nor do they justify petitioner's request for the opportunity to further develop the issue. Habeas relief is not warranted based on Ground III.

---

[12] *The court previously denied petitioner's request to depose all of the jurors for additional information they may have had as to his restraint during trial. Docs. 24 and 42.*

**D.    Ground IV:  Prosecutorial Misconduct.**

In his fourth ground for relief, petitioner asserts that prosecutorial misconduct affected the fairness and reliability of his sentencing proceeding.  Particularly, petitioner complains about several comments made by the prosecutor during second stage closing argument. Petitioner raised this claim on direct appeal but was denied relief.  <u>Sanchez</u>, 223 P.3d at 1004-06.  Respondent argues that this claim should be denied because petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.  Respondent is correct.

Claims regarding improper prosecutorial argument are subjected to due process review.  The question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).  As the Supreme Court has acknowledged, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." <u>United States v. Young</u>, 470 U.S. 1, 11 (1985).

Petitioner's first contention is that the prosecutor violated <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 328-29 (1985), wherein the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  In <u>Caldwell</u>, the prosecutor argued that the jury's return of a death

sentence was not final. In particular, the prosecutor told the jury, "Your job is reviewable," and "the decision you render is automatically reviewable by the Supreme Court." Id. at 325-26.

Petitioner supports his Caldwell claim with reference to the following comments:

> One thing that I ask that you do, as I go through the evidence, as you get back to the jury room to deliberate, is keep in mind the burden that's on your shoulder. Not one of you, no one individually will decide whether this man receives the death penalty or not.

> You can't do that. That's not the law. No one here, not one of you can sentence this man to death. A juror cannot sentence a person to death or life or life without the possibility of parole. Only a jury can, a jury of 12 people.

> So if this man receives the death penalty, and that's what Mr. Sitzman and I are going to be asking you to return, if he receives the death penalty, it will be because not one, not two, not ten, but twelve people who listened to the evidence for two weeks, who listened to the law, made that decision that it was appropriate.

> Don't let anyone - - Ms. Box, Mr. Lyman [defense counsel] - - don't let yourself, don't let anyone put that burden on your shoulder that it's your decision and your decision alone. That's too big of a burden. You shouldn't have that burden. The law doesn't allow you to have that burden. The way our system works, 12 people have to return a verdict.

(J. Tr. XV, 3197-98). Although petitioner acknowledges the "technical accuracy" of these comments, he nevertheless argues that their "import" makes them similar to the ones condoned in Caldwell because they had the effect of "minimizing individual jurors' sense of responsibility." Petition, p. 40; Reply, p. 16. Petitioner contends that while it is true that a death sentence requires a unanimous verdict, the prosecutor's comment that a single juror could not sentence him to life or life without parole is erroneous because a single juror could

withhold his or her assent to a death verdict resulting in a hung jury and the imposition of a life or life without parole sentence. Petition, p. 41. Petitioner additionally asserts that the comments "effectively told the jury that an individual juror's sense of morality and mercy not only did not count, but would be contrary to the law." Id. at 42.

In denying petitioner relief, the OCCA found the prosecutor's comments to be "legally accurate." Sanchez, 223 P.3d at 1004. The OCCA additionally found as follows:

> [Petitioner's] real complaint here is that the prosecutor's argument might have diminished a successful defense based on the fact that in Oklahoma, "a single juror has the power to prevent a death sentence in a given case." Malone v. State, 2007 OK CR 34, ¶ 73, 168 P.3d 185, 215. The prosecutor's argument certainly anticipated common capital defense rhetoric emphasizing the individual moral responsibility of each juror in voting to "kill" the defendant, in the hopes that one or more jurors will hold out against a death verdict favored by the others. The fact that a prosecutor anticipates a known defense argument and presents a counterpoint is not fundamentally unfair. A few pages later in this allegedly improper argument, we find the prosecutor telling jurors:
>
>> But, basically, you've got three choices. You've got one crime, murder in the first degree. The defendant has been found guilty of that, and you've got to decide, does that person receive death, does that person receive life in prison without the possibility of parole, or does Mr. Sanchez receive a term of life in prison with the possibility of parole. *Bottom line is if you don't want to do it, you don't have to. Read all these instructions. They're very important, none more than any of the others. But the bottom line is, you don't want to, you don't think it's appropriate, you don't have to.* If you do think it's appropriate, then what Mr. Sitzman read in his opening, the Bill of Particulars, and what the Judge has talked about, the aggravating circumstances, become very important (emphasis added).
>
> In the context of the entire argument and in light of other comments, these comments were not plain error.

Sanchez, 223 P.3d at 1004-05.  In order to obtain relief, petitioner must show that the decision by the OCCA is contrary to or an unreasonable application of Caldwell.  The court concludes he has not done so.

It was reasonable for the OCCA to conclude that the jury was not misled as to its responsibilities by the arguments of the parties.  The prosecutor's comments were factually correct–in order to sentence petitioner to any of the punishment options, the jurors had to be unanimous (O.R. V, 830) (Instruction No. 17: "In the event you assess the death penalty, your verdict must be unanimous.  You may also return a unanimous verdict of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole.").  Although petitioner is correct in arguing that one or more holdout jurors could have resulted in a hung jury and caused the imposition of a life or life without parole sentence, and that the prosecutor did argue against a hung jury, there is no indication that the prosecutor's comments belittled the jury's role in assessing punishment or otherwise misled them as to their options.  This is clear in light of his later comment that the decision was theirs: "the bottom line is, you don't want to, you don't think it's appropriate, you don't have to" (J. Tr. XV, 3199).  In addition, defense counsel also discussed the issue with the jury.  Although petitioner asserts that he did not have an opportunity to respond to the prosecutor's comments, this is simply incorrect.  Petition, p. 43.  The comments about which petitioner complains were made during the prosecution's first closing argument (J. Tr. XV, 3197-98), and defense counsel did in fact respond to the comments in his closing argument.  While acknowledging the requirement of a unanimous verdict, defense counsel reminded the jurors

31

that it was an important individual decision. He told them that while they should respect the opinions of their fellow jurors, they should listen to their hearts and stick to what they believed was the right thing to do (J. Tr. XV, 3218-19, 3220).

And finally, there is no question that the instructions given accurately stated the jury's role in assessing punishment, including (1) the necessity of finding at least one aggravating circumstance unanimously and beyond a reasonable doubt before imposing a sentence of death; (2) its consideration of mitigating circumstances, requiring neither unanimity nor proof beyond a reasonable doubt; (3) the necessity of finding that the aggravating circumstances outweigh the mitigating circumstances before imposing a sentence of death; (4) that even if it found that the aggravating circumstances outweighed the mitigating circumstances, it could nevertheless impose a sentence less than death; and (5) unlike with its determination of guilt, it could consider sympathy and sentiment in deciding whether the defendant should be sentenced to death (O.R. V, 823, 826, 827, 830). Moreover, and of particular importance, the jury was expressly told that its verdict was not to be one of chance, but one that "rest[s] . . . on the belief of each of you who agrees with it" (O.R. V, 830). See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."). Under all of these circumstances, the court concludes that petitioner has not shown the OCCA's decision to be contrary to or an unreasonable application of Caldwell.

Next, petitioner asserts that the prosecutor argued facts not in evidence and used "[f]ear-[m]ongering" and speculation to inject unconstitutional emotion into the jury's

sentencing determination.  Petition, pp. 43, 45.  The argument to which petitioner objects is

as follows:

> To those who would say, Well, let's just put him in prison for the rest
> of his natural life, he won't be a threat to society, prison includes - - or society
> includes prison, that's the law.  He will be in a smaller part of society, but that
> is society.
>
> You know what they call these when they issue them at the commissary
> at the prison?  They call them shoelaces.  You know what they call them when
> they're used later for a not-so-nice purpose?  They call it a garrote.
>
> You know what they call this?  It's an antique letter opener.  You know
> what they call it in prison?  You call it a shank.  You know what they call that
> baseball bat that you check out at the prison gym to play softball with?  You
> call it a softball bat.  You know what you call it when you use it on another
> person's head?  You call it a club.

(J. Tr. XV, 3229-30).  In denying relief, the OCCA found that this argument was both proper

and persuasive as it related to the continuing threat aggravating circumstance because it was

"based on properly admitted evidence of [petitioner's] use of both ordinary items and

dangerous weapons to subdue and attack innocent people."  Sanchez, 223 P.3d at 1005.  The

evidence showed that when the body of Ms. Busken was found, her hands were tied behind

her back with black shoelaces (J. Tr. VIII, 2122-23; State's Exhibit 18).  In addition to this

first stage evidence, evidence was also introduced in the second stage that petitioner raped

his former girlfriend in 2001, and in the course of this offense, he used her own shoelaces to

tie up her hands (J. Tr. XIV, 3021-24).  In light of this evidence, the prosecutor's argument

was reasonable, and the court cannot conclude that the OCCA acted unreasonably in denying

petitioner relief based on this claim.

In his third allegation of prosecutorial misconduct, petitioner asserts that the prosecutor's multiple references to him as evil constituted impermissible personal opinion and denied him a fundamentally fair sentencing. Petition, pp. 45-46 (setting forth the challenged comments). The OCCA denied relief on this claim as follows:

> [Petitioner] next objects to several comments referring to [petitioner] and his actions as evil, and stating that some people come to symbolize evil by their infamous acts. The prosecutor stated at one point, "This is the handiwork—the evil handiwork of a heartless, merciless, pitiless, cruel, and depraved executioner." We see nothing unfair in these comments. Premeditated murder has been regarded as the pinnacle of evil in every age, and our law reflects this. Blackstone described willful murder as "a crime at which human nature starts [i.e., recoils], and which is I believe punished almost universally throughout the world with death." 4 W. Blackstone, Commentaries 194. The Oklahoma Uniform Jury Instructions–Criminal define the "especially heinous, atrocious, or cruel," aggravating circumstance with reference to how a murderer's depravity and savagery shock the senses of humankind:
>
>> The term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others.
>
> Instruction No. 4–73, OUJI–CR(2d). We see an important distinction between a comment on the murderous human evil made relevant by the especially heinous, atrocious, or cruel aggravating circumstance, and the rhetorical indulgence of calling defendant a monster, a devil, or other inhuman entity. The comments here addressed the distinctly human evil involved in this case. We will not require counsel in such serious cases to address the jury with lifeless and timid recitations void of moral reflection or persuasive power. The wickedness of the murder itself, and the convicted murderer's indifference to, or enjoyment of, the suffering of others, were relevant, and the comments here were properly based upon the evidence.

Sanchez, 233 P.3d at 1005 (citations omitted). The OCCA's treatment of this issue falls far short of the sort of "extreme malfunction" which this court is empowered to correct. Richter, 131 S.Ct. at 786.

In order to prove the especially heinous, atrocious, or cruel aggravating circumstance, the state was required to show beyond a reasonable doubt that the murder was heinous. Whether a murder is heinous depends on "the facts and circumstances of [the] case," and the term heinous was defined for the jury as "extremely wicked or shockingly evil" (O.R. V, 820). The prosecutor's references to evil related to this burden of proof and were therefore relevant. It was fair argument for the prosecutor to refer to petitioner as an "evil presence" and his crime as "the evil handiwork of a heartless, merciless, pitiless, cruel and depraved executioner" (J. Tr. XV, 3226, 3231). These comments were grounded in the facts and circumstances of the case, which showed that on a bitter cold morning five days before Christmas, petitioner abducted an innocent young college student and, after raping and sodomizing her, shot her in the back of the head in a remote lakeshore area.

Moreover, while petitioner faults the prosecutor for making references to evil, respondent has accurately pointed out that defense counsel was actually the first to inject the notion of evil. Response, p. 60. In closing argument, defense counsel acknowledged that a death sentence would "eliminate evil" and "extract the punishment that it needs to extract." However, because a death sentence would also eliminate the good in petitioner, defense counsel asked the jury to consider that petitioner was "not the sum total of one day or several days." He argued that if the jury returned a death sentence, it would "eliminate the good [in

petitioner] as well" (J. Tr. XV, 3221, 3222). In these circumstances, the OCCA's treatment

of the references to "evil" was well within the bounds of the AEDPA.

Petitioner's final assertion of prosecutorial misconduct also does not warrant relief.

He asserts that the prosecutor improperly referenced God (and his forgiveness) and that the

OCCA erred in finding that defense counsel opened the door to the argument. Petitioner

additionally contends that the prosecutor's argument amounts to a Caldwell violation.[13] The

OCCA's determination of this claim is both thorough and well-reasoned. Sanchez, 223 P.3d

at 1005-06. After finding that it was the defense, and not the prosecution, who "interject[ed]

divine reckoning into the sentencing proceeding," the OCCA ultimately concluded as

follows:

> The prosecutor's brief personal reflections about the forgiveness of God
> "were no more than an adversarial balance to [petitioner's] positions on
> religion." Cole v. State, 2007 OK CR 27, ¶ 57, 164 P.3d 1089, 1101. The
> argument did not, as [petitioner] hyperbolically contends, reassure jurors "that

---

[13] *Respondent asserts that this __Caldwell__ claim is unexhausted and should be procedurally barred because petitioner did not raise this claim on direct appeal or in his application for post-conviction relief. Response, pp. 63-64. Petitioner did not address this issue in his reply. While any attempt by petitioner to exhaust this claim now would likely result in the application of procedural bar by the OCCA, it is unnecessary to belabor the point, as the issue may be easily disposed of on the merits. 28 U.S.C. § 2254(b)(2). The comment at issue was made by the prosecutor in the course of explaining how he had been able to serve in his role for almost thirty years and ask jurors to impose the death penalty, which is "something . . . against their human will, against their human nature, against their very goodness, something unnatural[.]" The prosecutor told the jury that he was able to do his job because he knew that his God would forgive him (J. Tr. XV, 3232-33). Although petitioner asserts that this comment suggested to the jurors that if they returned a death sentence God would forgive them as well, Petition, p. 47, this court, like the OCCA, concludes that petitioner's interpretation of the comment is more than a stretch. __Sanchez__, 223 P.3d at 1005 ("Counsel for [petitioner] reads the prosecutor's comments imaginatively, at the least."). Petitioner's __Caldwell__ claim fails because he has not "show[n] that [this comment] to the jury improperly described the role assigned to the jury by local law." __Duggers v. Adams__, 489 U.S. 401, 407 (1989).*

36

they, too, would be forgiven for imposing the death penalty;" nor did it "encourage the jury to follow biblical standards rather than the Court's instructions." <u>Powell v. State</u>, 2000 OK CR 5, ¶¶ 146–149, 995 P.2d 510, 538–539.

Our decisions on this subject serve to warn that a prosecutor who calls upon Heaven to witness the State's cause against the capital defendant will needlessly imperil the earthly judgment of the District Court. But the religious statements made by counsel for both parties here were brief and insignificant in view of the overwhelming evidence of aggravating circumstances, which clearly explain the jury's verdict.

<u>Sanchez</u>, 223 P.3d at 1006. This conclusion is reasonable.

For the reasons set forth above, the court concludes that petitioner has not demonstrated a basis for relief based on Ground IV.

**E.    Ground V: Ineffective Assistance of Trial Counsel.**

Petitioner's fifth ground for relief relates to the effectiveness of his trial counsel. In two specific complaints,[14] petitioner asserts that his trial counsel was ineffective for failing to (1) produce evidence that someone else, and particularly petitioner's father, may have committed the crimes against Ms. Busken, and (2) object to the prosecutor's second stage closing argument referenced in Ground IV. Respondent alleges, and petitioner does not dispute, that his first complaint is unexhausted. Petitioner's second complaint was

---

[14] *In his introduction to this ground for relief, petitioner makes several general and unsupported statements regarding additional alleged failings of his trial counsel, including the failure to question how the DNA evidence was handled and examined, failure to present an alibi defense, and failure to protect petitioner's rights and provide a vigorous defense. Petition, p. 51. It is unnecessary to address these bare statements as they are wholly insufficient to plead a constitutional claim.*

unsuccessfully presented to the OCCA on direct appeal. <u>Sanchez</u>, 223 P.3d at 1012. Neither complaint warrants relief here.

As just stated, petitioner's first complaint was not presented to the OCCA and is therefore unexhausted. Because the OCCA would refuse to entertain the merits of the claim due to petitioner's failure to raise it in his first post-conviction application, respondent asserts that this court should view it as procedurally barred.[15] Response, p. 65. <u>See</u> <u>Lott v. Trammell</u>, 705 F.3d 1167, 1179 (10th Cir. 2013) (citing <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007), and applying an anticipatory procedural bar to an unexhausted claim), <i>cert. denied</i>, ___ U.S. ___, 134 S.Ct. 176 (2013). Petitioner does not dispute this contention, but instead asserts that he has made a colorable showing of innocence which permits habeas review of his claim. Reply, pp. 20-21.

It is clear that a "federal court may nevertheless consider claims subject to an anticipatory procedural bar . . . if denying review would result in a fundamental miscarriage of justice because the petitioner has made a 'credible' showing of actual innocence." <u>Frost v. Pryor</u>, 749 F.3d 1212, 1231 (10th Cir. 2014) (citations omitted). The fundamental miscarriage of justice exception addresses those rare instances "where the State has convicted the wrong person of the crime." <u>Sawyer v. Whitley</u>, 505 U.S. 333, 340 (1992).

---

[15] *The Tenth Circuit has repeatedly recognized the application of a procedural bar to claims which could have been raised in an initial post-conviction application but were not. <u>See</u> <u>Bland v. Sirmons</u>, 459 F.3d 999, 1012 (10th Cir. 2006); <u>Medlock v. Ward</u>, 200 F.3d 1314, 1323 (10th Cir. 2000); <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1267 (10th Cir. 1999); <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1096-97 (10th Cir. 1998).*

> "[T]he fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." Schlup v. Delo, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To make a credible showing of actual innocence, a "petitioner must 'support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Cummings, 506 F.3d at 1223 (quoting Schlup, 513 U.S. at 324, 115 S.Ct. 851). This new evidence "must be sufficient to 'show that it is more likely than not that no reasonable juror would have convicted the petitioner in the light of the new evidence.'" Id. (quoting Schlup, 513 U.S. at 327, 115 S.Ct. 851); accord House, 547 U.S. at 539–40, 126 S.Ct. 2064 (reaffirming the Schlup test after AEDPA). This standard is "demanding and permits review only in the extraordinary case." House, 547 U.S. at 538, 126 S.Ct. 2064 (quotations omitted).

Frost, 749 F.3d at 1231-32.

Petitioner's showing here does not come remotely close to establishing a miscarriage of justice under this standard. His argument completely ignores the fact that his semen was found in Ms. Busken's panties, other than to suggest that the presence of his "DNA pattern" might be explained if his father was the actual perpetrator. Petition, p. 52. This argument, however, is contrary to the expert evidence presented at trial that petitioner and his father would not have the exact same DNA (J. Tr. XII, 2750-51). Moreover, the DNA evidence presented at trial showed more than just a pattern match. Petitioner's DNA matched the DNA extracted from two semen deposits (Ms. Busken's panties and her ballet leotard) at every one of the sixteen genetic loci tested (State's Exhibit 106).[16] This was a near certain

---

[16] *The record reflects that the defense conducted its own independent testing of the evidence (J. Tr. XII, 2746-47).*

match.  Sanchez, 223 P.3d at 989-90 ("The State's DNA expert characterized the probability

of a random DNA match on the Busken evidence with an unrelated individual other than

[petitioner] as 1 in 200.7 trillion Caucasians, 1 in 20.45 quadrillion African Americans, and

1 in 94.07 trillion Southwest Hispanics.").  Because petitioner has not shown that a

fundamental miscarriage of justice will occur if this court refuses to review his first

complaint of trial counsel ineffectiveness,[17] the court concludes it is procedurally barred.

Petitioner's second complaint, concerning his trial counsel's failure to object to the

prosecutor's second stage closing argument, was addressed by the OCCA on the merits on

direct appeal.  Referring to its analysis of petitioner's prosecutorial misconduct claim, the

OCCA stated: "Because we found no prosecutorial misconduct . . . , counsel's failure to

object to the challenged comments at trial provides no ground for a claim of ineffective

assistance on appeal."  Sanchez, 223 P.3d at 1012.  Having also reviewed the underlying

claim of prosecutorial misconduct and found no basis for relief, see Ground IV, supra, the

court concludes that the OCCA's determination of this issue was reasonable.  See

Strickland v. Washington, 466 U.S. 668 (1984) (requiring both deficient performance and

prejudice to establish a claim of ineffective assistance of counsel).  See also Freeman v.

Attorney General, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for

failing to raise a meritless claim . . . .");  Snow, 474 F.3d at 724-25 (trial counsel was not

ineffective for failing to object to certain evidence that the OCCA found admissible);

---

[17] *Petitioner's requests for an investigator and an evidentiary hearing on this issue have
already been denied.  Docs. 20 and 43.*

Spears v. Mullin, 343 F.3d 1215, 1249 (10th Cir. 2003) (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found that sufficient evidence supported the giving of the instruction).

Petitioner's fifth ground does not state a basis for habeas relief.

### F. Grounds VI and X: Ineffective Assistance of Appellate Counsel and the Avoiding Arrest Aggravating Circumstance.

In Ground VI, petitioner asserts that his appellate counsel was ineffective for failing to raise two issues on direct appeal. One involves the "avoiding arrest" aggravating circumstance which petitioner has presented as an independent claim in Ground X. The other involves Petitioner's absence from a portion of the jury selection process. Petitioner presented these issues to the OCCA in his post-conviction application but was denied relief. Sanchez, No. PCD-2006-1011, slip op. at 3-9. Respondent asserts that relief should be denied on this ground because petitioner has not shown that the OCCA's decision was contrary to or an unreasonable application of Supreme Court law.

Claims regarding the effectiveness of appellate counsel are governed by Strickland. Milton v. Miller, 744 F.3d 660, 669 (10th Cir. 2014) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000)). In accordance with Strickland, a petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal. Robbins, 528 U.S. at 285-86; Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting Ellis v. Hargett, 302 F.3d 1182, 1186-87 (10th Cir. 2002)). When counsel has

filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim.  Robbins, 528 U.S. at 288.  Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit.  In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail."  Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)).  "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on briefs are widely imposed."  Jones, 463 U.S. at 752-53.

In order to evaluate appellate counsel's actions, the omitted issues must be examined. The Tenth Circuit has provided the following guidance:

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003) (footnote omitted) (citations omitted).

First, petitioner asserts that his appellate counsel should have challenged the avoiding arrest aggravating circumstance on direct appeal.  Specifically, he claims this aggravating circumstance is invalid because the state alleged three predicate crimes (kidnapping, rape,

and sodomy) and the record does not show that the jury reached a unanimous agreement with respect to the particular predicate crime petitioner committed.

In its denial of this claim on post-conviction, the OCCA rejected outright petitioner's assertion that unanimity was required with respect to the predicate crime:

> Petitioner provides no authority in which this Court or the United States Supreme Court has held jurors must unanimously find that a capital defendant committed a *specific predicate crime* in connection with a finding that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

Sanchez, No. PCD-2006-1011, slip op. at 8. Then, after setting forth the state law governing the proof necessary to legally support the avoid arrest aggravating circumstance, id., the OCCA found that because the evidence supported the jury's finding of the aggravating circumstance in petitioner's case, petitioner's appellate counsel was not ineffective for failing to raise this claim on direct appeal.

> The State at trial asserted at least three predicate crimes in support of the allegation that Petitioner committed this murder to avoid or prevent a lawful arrest or prosecution. We find the evidence sufficiently establishes that Petitioner committed several predicate crimes against his victim, including forcible rape, anal sodomy, and kidnapping; and murdered her with the intent to prevent his identification as the perpetrator. Petitioner presents no controlling law requiring that jurors unanimously agree he committed a specific predicate crime in connection with its finding of this aggravating circumstance. Even if such an assurance were required by law, the jury's unanimous verdicts finding [Petitioner] guilty of forcible rape and anal sodomy provide conclusive evidence of unanimity concerning at least two of the predicate crimes supporting the aggravating circumstance here. Petitioner fails to show either deficient performance in the omission of this claim on direct appeal, or the requisite prejudice resulting from counsel's alleged unprofessional error.

Id. at 9.

Petitioner has not shown that this determination by the OCCA is contrary to or an unreasonable application of Strickland or of the applicable law generally.[18] Although petitioner continues to assert that Oklahoma law requires unanimity as to the specific predicate crime, petitioner cites no more authority than what he presented to the OCCA, and the cases cited by petitioner simply do not support the assertion he makes.[19] In addition, as the OCCA held, because the jury returned unanimous verdicts in the first stage finding petitioner guilty of both rape and sodomy, the predicate crime for the avoiding arrest aggravating circumstance is amply supported. Therefore, it is clear that had petitioner's appellate counsel raised this claim on direct appeal, it would not have been successful. Accordingly, petitioner's challenge to this aspect of his appellate counsel's representation fails. In addition, for the same reasons, the court also denies habeas relief based on petitioner's related claim in Ground X.

---

[18] *Petitioner concedes the federal constitution does not impose a jury unanimity requirement. Petition, p. 86 (citing Johnson v. Louisiana, 406 U.S. 356 (1972)).*

[19] *The two state cases cited by petitioner are Primeaux v. State, 88 P.3d 893, 909 (Okla. Crim. App. 2004), and Phillips v. State, 641 P.2d 556, 559 (Okla. Crim. App. 1982), and neither hold that unanimity is required as to the specific predicate crime for the avoiding arrest aggravating circumstance. Petition, pp. 86-87. From these cases, which address the evidence sufficient to support a conviction when alternative theories of murder are charged, petitioner argues that if the evidence in his case supported all of the predicate crimes alleged by the state, then the jury's finding of the avoiding arrest aggravating circumstance would be valid, but because petitioner contends that the evidence was insufficient to support his rape conviction, the avoiding arrest aggravating circumstance cannot stand. Regardless of whether petitioner's legal argument based on Primeaux and Phillips is faulty, it fails on another basis as well–the OCCA specifically and correctly held on direct appeal that petitioner's rape conviction was supported by constitutionally sufficient evidence. Sanchez, 223 P.3d at 1002-03.*

Petitioner's second complaint as to his appellate counsel's performance is the failure to assert a claim regarding petitioner's absence from initial voir dire proceedings. The record reflects that, prior to conducting individual voir dire, the trial court gave the entire jury pool (120 prospective jurors) a brief orientation. The orientation covered such general topics as their civic duty, the importance of being on time, the role of the bailiffs, where they should park, where the restrooms and vending machines were located, the necessity of being truthful during questioning, the avoidance of outside influence and/or publicity, and the individual voir dire schedule and procedure. The trial court conducted the entire orientation, and the jurors were not questioned about their qualifications to serve. The apparent reason for petitioner's absence from this orientation was his objection to be restrained during trial (J. Tr. I, 18-46).[20] Petitioner asserts that he had a constitutional right to be present for the orientation and that his absence was structural error. He therefore contends that had appellate counsel raised the claim on direct appeal, he would have obtained relief.

In Snyder v. Massachusetts, 291 U.S. 97, 105-106 (1934), *overruled in part on other grounds by* Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Supreme Court held that a defendant "has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Thus, the right is not absolute, and it is not

---

[20] *The orientation was the only portion of trial proceedings which petitioner missed. Petitioner voluntarily appeared by the start of individual voir dire and was present for the remainder of the trial.*

automatically infringed when a defendant is absent from some portion of the proceedings. Bland, 459 F.3d at 1020-21. A due process violation occurs only when "a fair and just hearing would be thwarted by his absence . . . ." Snyder, 291 U.S. at 108. See also United States v. Gagnon, 470 U.S. 522, 526 (1985) (quoting Snyder). There is no violation where a defendant's "presence would be useless, or the benefit but a shadow." Snyder, 291 U.S. at 106-07. The determination of whether a defendant's absence violates due process requires consideration of the whole record. Gagnon, 470 U.S. at 526-27.

In concluding that appellate counsel was not ineffective for failing to raise this claim, the OCCA found that petitioner's refusal to attend the orientation did not entitle him to relief.

> We have repeatedly held that a defendant waives the right to be present at trial by his voluntary absence from the proceedings. Clark v. State, 1986 OK CR 65, ¶ 9, 718 P.2d 375, 377. Petitioner's legal remedy against the District Court's shackling order was to appeal his conviction if subjected to a trial in shackles, not to refuse to attend the trial itself.

Sanchez, No. PCD-2006-1011, slip op. at 6. The OCCA additionally held as follows:

> Petitioner has not shown the deficient performance or prejudice necessary for a violation of the right to effective appellate counsel. He was voluntarily absent from trial and waived his right to be present. Even if Petitioner had been erroneously excluded from this part of the trial, he could not show this exclusion impaired his ability to defend himself on the merits. He was not denied the right to confront witnesses, to give material testimony in his defense, or assist his counsel at a critical stage of the trial. The proceedings from which Petitioner absented himself were clearly "too inconsequential to the 'fullness of his opportunity to defend against the charge' to raise to a level of a due process violation." Gregg, ¶ 26, 844 P.2d at 877, quoting Snyder, 291 U.S. at 105-06, 54 S.Ct at 332. Because this claim is not supported by the facts or case law, omission of this issue from the direct appeal was objectively reasonable.

Id. at 7.  In denying petitioner relief on this claim, the OCCA correctly applied Strickland and Snyder and reached a reasonable result.

Habeas relief is not warranted based on claimed deficiencies in the performance of appellate counsel.

### G.    Ground VII:  Fourth Amendment Claim.

Petitioner's Ground VII is a Fourth Amendment challenge to the seizure of his DNA. As set forth in the OCCA's direct appeal opinion, petitioner's DNA was collected by the Oklahoma Department of Corrections while petitioner was serving a prison sentence for second degree burglary.  By state statute, the collection was authorized because petitioner had been convicted of a felony offense. Petitioner's DNA profile was maintained in the state's Combined DNA Index System (CODIS), and petitioner was linked to Ms. Busken's murder when "[his] DNA profile . . . generated a hit on the unknown DNA profile associated with [Ms. Busken's] murder."  Sanchez, 223 P.3d at 989, 997-98.

In response to this claim, respondent asserts consideration of it is precluded by Stone v. Powell, 428 U.S. 465 (1976).  In Stone, the Supreme Court held "that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Stone, 428 U.S. at 494 (footnote omitted).  Because this issue was litigated in the trial court and on direct appeal, respondent argues that the parameters of Stone have been satisfied.  Response, pp. 80-81.  In his reply, petitioner does not challenge respondent's contention.  In fact, he

"concedes that the consideration of [this ground for relief] is foreclosed by <u>Stone</u> . . . ." Reply, p. 25.

Given petitioner's concession, no further discussion is necessary.[21]   Petitioner's Ground VII does not state a basis for relief.

**H.       Grounds VIII and XI:  Continuing Threat Aggravating Circumstance.**

In Grounds VIII and XI, petitioner challenges the continuing threat aggravating circumstance, one of the three aggravating circumstances supporting the jury's death verdict. In Ground VIII, petitioner argues that certain evidence should not have been admitted as proof of this aggravating circumstance. In Ground XI, petitioner challenges the constitutionality of the aggravating circumstance, claiming it lacks the required narrow tailoring.  Petitioner presented these challenges on direct appeal.  The OCCA denied relief. <u>Sanchez</u>, 223 P.3d at 1003-04, 1006-11.  Respondent contends that relief must be denied as to both grounds because petitioner has failed to show that the OCCA's determination of these issues was contrary to or an unreasonable application of Supreme Court law.  The court agrees.

Petitioner's evidentiary challenge concerns evidence that he raped a former girlfriend. He contends that because the rape charge was dropped as part of a plea agreement, the state should not have been permitted to rely on it in support of the continuing threat aggravating

---

[21] *However, the court notes the Supreme Court's recent decision in <u>Maryland v. King</u>, 569 U.S. ___, 133 S.Ct. 1958 (2013). In <u>King</u>, the Supreme Court found that Maryland's collection of DNA from arrestees "can be considered part of a routine booking procedure." Because it is similar to fingerprinting and photographing, it is "a legitimate police booking procedure that is reasonable under the Fourth Amendment."  <u>Id.</u> at 1980.*

circumstance. Although petitioner acknowledges that "it is not unusual for *unadjudicated* offenses to be present [sic] in the punishment phase of capital trials," he asserts that the because the rape charge was dismissed as part of a plea agreement, it was actually an *adjudicated* offense. Petition, p. 78 (emphasis added).

In denying petitioner relief, the OCCA held in pertinent part as follows:

> Our prior decisions indicate the State may prove the continuing threat aggravating circumstance "through the introduction of Judgments and Sentences showing a history of violent criminal behavior or through the introduction of additional evidence detailing the defendant's participation in other unrelated crimes, or both." Malone v. State, 1994 OK CR 43, ¶ 39, 876 P.2d 707, 717–18. We have long recognized that "unadjudicated offenses linked to a defendant in a capital case may be introduced to support the claim of future dangerousness." Walker v. State, 1986 OK CR 116, ¶ 46, 723 P.2d 273, 285. The State's decision to enter into a plea bargain with a defendant, or even dismiss charges based on the defendant's violent actions, has no bearing on whether the underlying violent conduct is admissible to prove future dangerousness. Walker v. State, 1992 OK CR 10, ¶ 20, 826 P.2d 1002, 1007 (State's subsequent dismissal of pending rape charge did not affect admissibility of underlying criminal acts offered to prove continuing threat aggravating circumstance); Vega v. Johnson, 149 F.3d 354, 359 (5th Cir.1998) (testimony by victim that defendant committed unadjudicated sexual assault was admissible to prove future dangerousness in capital sentencing, despite acquittal of a related gun possession charge connected to the assault).
>
> A defendant's conviction or acquittal of a criminal charge neither alters the basic evidentiary facts of the underlying conduct, nor determines whether those facts may be offered to show his future dangerousness in a capital sentencing trial. Relevant evidence of a capital defendant's violent acts is admissible to show the existence of the continuing threat aggravating circumstance, whether those acts resulted in a conviction of the actual offense, some related or lesser included offense, or no conviction at all. Cf. Smith v. State, 2007 OK CR 16, ¶ 78, 157 P.3d 1155, 1178. [Petitioner's] sexual assault of an ex-girlfriend in 2001, almost five years after the murder of Juli Busken,

and his resulting second degree burglary conviction, were relevant to the jury's consideration of this aggravating circumstance.

Sanchez, 223 P.3d at 1003-04. Petitioner's scant argument and citation to authority have not shown that this decision by the OCCA was contrary to or an unreasonable application of Supreme Court law. It was reasonable for the OCCA to conclude that the challenged evidence was both relevant and admissible in the determination of whether petitioner was a continuing threat to society. See Wilson, 536 F.3d at 1110 (proof of the continuing threat aggravating circumstance requires a "show[ing] that a particular defendant has a pattern of criminal conduct likely to continue in the future" and "[t]he state may introduce evidence of both adjudicated, and unadjudicated, conduct").

Regarding petitioner's constitutional challenge to the continuing threat aggravating circumstance, the court concludes it should be denied as well. On direct appeal, the OCCA addressed a much more expansive argument than petitioner presents here, but the end result was a finding that the continuing threat aggravating circumstance is constitutionally sufficient. Sanchez, 223 P.3d at 1006-11. In pertinent part, the OCCA concluded:

> We find the continuing threat aggravating circumstance is consistent with both traditional and modern standards of decency as reflected in the Supreme Court's decisions. The incapacitation rationale and the statutory language of the aggravating circumstance contain a common-sense core of meaning that criminal juries are capable of understanding. Future dangerousness is historically and logically relevant to whether a convicted murderer should suffer the extreme penalty. The continuing threat aggravating circumstance therefore narrows the class of convicted murderers eligible for the death penalty in a meaningful way, and when combined with other

procedural safeguards in the Oklahoma statutes, sufficiently minimizes the risk of a wholly arbitrary death sentence for first degree murder.

Id. at 1011.

In order to satisfy the Eighth Amendment, an aggravating circumstance must meet two requirements: (1) it may not apply to every defendant convicted of murder; and (2) it may not be unconstitutionally vague. Tuilaepa v. California, 512 U.S. 967, 972 (1994). In petitioner's case, the jury was instructed that the continuing threat aggravating circumstance required finding beyond a reasonable doubt "that [petitioner's] behavior has demonstrated a threat to society" and "a probability that this threat will continue to exist in the future" (O.R. V, 822). Petitioner has not shown that this aggravating circumstance violates the Tuilaepa standard for constitutionality, and given that the Tenth Circuit has repeatedly upheld this aggravating circumstances in light of numerous constitutional challenges, the court declines petitioner's invitation to reconsider the issue. See Wilson, 536 F.3d at 1109 ("We have repeatedly upheld the constitutionality of this aggravator."); Brown v. Sirmons, 515 F.3d 1072, 1092 (10th Cir. 2008) ("We have repeatedly upheld the constitutionality of this aggravating factor, finding it neither unconstitutionally vague nor overbroad."); Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002) ("Tenth Circuit precedent forecloses Sallahdin's argument that Oklahoma's application of the continuing threat aggravator is unconstitutional."); Medlock, 200 F.3d at 1319 ("Our Circuit has repeatedly upheld the facial constitutionality of [the continuing threat aggravator] as 'narrowed' by the State of Oklahoma, and we are bound by that body of precedent.").

For the foregoing reasons, the court concludes that petitioner's Grounds VIII and XI do not warrant habeas relief.

## I.    Ground IX:  Mitigating Circumstances Instruction.

In his ninth ground for relief, petitioner asserts that the trial court gave a uniform jury instruction which prevented the jury from considering all of his mitigating evidence as mandated by Lockett, 438 U.S. at 604.  Petitioner raised this claim on direct appeal but was denied relief.  Sanchez, 223 P.3d at 1011.  Respondent asserts that petitioner has failed to demonstrate that the rejection of this claim by the OCCA is contrary to or an unreasonable application of Supreme Court law.  In particular, respondent argues that the OCCA's decision is "entirely consistent with the Supreme Court's reasoning in Boyde [v. California, 494 U.S. 370 (1990)]." Response, p. 90.

In Lockett, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett, 438 U.S. at 604 (footnotes omitted).  Contrary to this holding, petitioner contends that his jury was given a definition of mitigating circumstances which limited its consideration of his mitigating evidence.  The instruction in question is Instruction No. 13, and the portion of the instruction which petitioner takes issue with is as follows: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" (O.R. V, 826).  Petitioner contends that

this language prevented the jury "from considering evidence of his character and record." Petition, p. 84.

In denying petitioner relief, the OCCA relied on its decision in <u>Harris v. State</u>, 164 P.3d 1103 (Okla. Crim. App. 2007). <u>Sanchez</u>, 223 P.3d at 1011. In <u>Harris</u>, the OCCA addressed the same issue raised in petitioner's case, and while the OCCA rejected the argument that "the current uniform jury instruction prohibits jurors from considering mitigating evidence[,]" <u>Harris</u>, 164 P.3d at 1113, it nevertheless acknowledged that there had been instances where prosecutors had played upon the language of the instruction in an attempt to limit a jury's consideration of a defendant's mitigating evidence.[22]

> This Court is troubled . . . by the consistent misuse of the language in this instruction in the State's closing arguments. This Court noted in <u>Frederick v. State</u> that the prosecutor could argue mitigating evidence did not reduce a defendant's moral culpability or blame. However, we did not intend to suggest that prosecutors could further argue that evidence of a defendant's history, characteristics or propensities should not be considered as mitigating simply because it does not go to his moral culpability or extenuate his guilt. This would be an egregious misstatement of the law on mitigating evidence.

<u>Id.</u> at 1114 (footnote omitted). Consequently, in an effort to "clarify" the instruction and to "discourage improper argument[,]" the OCCA determined that the instruction should be

---

[22] *The OCCA specifically referenced the Tenth Circuit's decision in <u>Le v. Mullin</u>, 311 F.3d 1002 (10th Cir. 2002). <u>Harris</u>, 164 P.3d at 1113 n.38, 1114 n.41. After detailing established precedent on a defendant's right to present mitigating evidence, the OCCA stated its agreement "with the Tenth Circuit's conclusion that any attempt to limit a jury's consideration of mitigating evidence only to that evidence which may make a defendant less guilty, or the crime less horrible, is unconstitutional. This is true whether the attempted limitation occurs through instruction or argument." <u>Id.</u> at 1113 (footnote omitted).*

amended.[23] Id.  Despite the amendment, however, the OCCA denied relief in petitioner's

case, just as it did in Harris.[24]  Sanchez, 223 P.3d at 396 ("Based on our treatment of the issue

in  Harris,  [petitioner]  has  not  shown  plain  error  in  the  District  Court's  use  of  the

instruction.").

In Boyde, the Supreme Court addressed the very claim raised by petitioner here, i.e.,

an Eighth Amendment claim that jury instructions prevented the jury from considering his

"non-crime-related" mitigation evidence.  Boyde, 494 U.S. at 372, 375, 377-378.  In Boyde,

the  Supreme  Court  determined  that  the  claim  should  be  reviewed  under  the  following

standard:  "whether there is a reasonable likelihood that the jury has applied the challenged

instruction in a way that prevents the consideration of constitutionally relevant evidence."

Id. at 380.  The Court explained:

> Although a defendant need not establish that the jury was more likely than not
> to have been impermissibly inhibited by the instruction, a capital sentencing
> proceeding is not inconsistent with the Eighth Amendment if there is only a
> possibility of such an inhibition. This "reasonable likelihood" standard, we
> think, better accommodates the concerns of finality and accuracy than does a
> standard which makes the inquiry dependent on how a single hypothetical
> "reasonable" juror could or might have interpreted the instruction. There is, of
> course, a strong policy in favor of accurate determination of the appropriate

---

[23] *Thereafter, and in accordance with the language proposed in* Harris, *164 P.3d at 1114,
the instruction, OUJI-CR (2d) 4-78, was amended in pertinent part as follows: "Mitigating
circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability
or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors
individually or collectively to decide against imposing the death penalty."*

[24] *In* Harris, *the OCCA found that one of the prosecutors made improper argument with
regard to the jury's consideration of the defendant's mitigating evidence; however, the OCCA
concluded that the error was harmless due to legally accurate comments made by a second
prosecutor in final closing argument as well as the instructions given.* Harris, *164 P.3d at 1113-14.*

sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Id. at 380-81 (footnote omitted).

In Boyde, the Supreme Court found that no Eighth Amendment violation occurred because the instruction itself was not limiting as the defendant suggested, and in light of other instructions given, it was "improbable that jurors would arrive at an interpretation that precludes consideration of all non-crime-related evidence." Id. at 382-83. The Court also found that given all of the mitigating evidence presented by the defense, it was "unlikely that reasonable jurors would believe the court's instructions transformed all of this 'favorable testimony into a virtual charade.'" Id. at 383 (quoting California v. Brown, 479 U.S. 538, 542 (1987)). And finally, the Supreme Court referenced the arguments made by the parties. Although the prosecutor had argued against the weight of the defendant's mitigating evidence, he never suggested that it should not be considered. In addition, defense counsel "stressed a broad reading" of the mitigation instruction. Id. at 384-86. In light of all of these circumstances, the Supreme Court "conclud[ed] there [was] not a reasonable likelihood that the jurors . . . understood the challenged instructions to preclude consideration of relevant mitigating evidence . . . ." Id. at 386. See also Ayers v. Belmontes, 549 U.S. 7, 12-24 (2006) (applying Boyde and Brown v. Payton, 544 U.S. 133 (2005), and finding no Eighth

Amendment violation); <u>Payton</u>, 544 U.S. at 141-47 (applying <u>Boyde</u> and finding no Eighth Amendment violation).

As in <u>Boyde</u>, the circumstances in petitioner's case support the OCCA's denial of relief. First, examining the instructions as a whole, it is improbable that the jury failed to consider all of petitioner's mitigation evidence. Instruction No. 12 advised the jury that petitioner had presented evidence of mitigating circumstances, and it specifically listed the following as mitigating circumstances: (1) his age; (2) his character; (3) his emotional/family history; and (4) that his life has value and meaning to others. In addition to this list, this same instruction told the jury that it "may decide that other mitigating circumstances exist, and if so, [it] should consider those circumstances as well" (O.R. V, 825). Instruction No. 13 also stated that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case," and the jury was advised by Instruction No. 17 that it "may consider sympathy or sentiment for the defendant in deciding whether to impose the death penalty[]" (O.R. V, 826, 830).

Second, it is simply unreasonable to conclude that the single sentence complained of by petitioner caused the jury to put aside the testimony of the nine witnesses (five relatives, two former teachers, and two friends) presented by petitioner in the second stage. To do so, the jury "would have had to believe that the penalty phase served virtually no purpose at all." <u>Payton</u>, 544 U.S. at 144.

And third, the closing arguments made by the parties in the second stage are consistent with a conclusion that the jury was not misled regarding its consideration of petitioner's

mitigating evidence. Urging the jury to be fair, sympathetic, and merciful (as per Instruction No. 13), defense counsel argued that petitioner's life had meaning as demonstrated by the witnesses presented on petitioner's behalf, and he requested that the jury return a sentence of life without parole because petitioner "is more than the sum total of one day" (J. Tr. XV, 3219-20, 3221, 3222-24). In response, the prosecutor asserted:

> Mitigation. You have been presented a list of witnesses who appeared before you yesterday to offer you what the defense hopes you will find is mitigating, a reason to find that [petitioner] is different and should deserve to live, despite what he has done.

> . . . .

> What this all boils down to - - what this is all boils down to, as [defense counsel] indicated, is that it all boils down to mercy, a plea to you for mercy.

> . . . .

> And so what it gets down to is mercy.

(J. Tr. XV, 3227, 3231).

In light of these circumstances, the court agrees with respondent that the OCCA's denial of relief in petitioner's case was consistent with the Supreme Court's decision in Boyde. Petitioner's Ground IX does not state a basis for relief.

### J.     Ground XII:  Cumulative Error.

In his final ground, petitioner asserts that he is entitled to relief based on a claim of cumulative error. Petitioner unsuccessfully raised a cumulative error claim with the OCCA on direct appeal and in his application for post-conviction relief. Sanchez, No. PCD-2006-1011, slip op. at 10; Sanchez, 223 P.3d at 1013. Respondent's initial contention is that the

absence of Supreme Court authority on the viability of a claim of cumulative error prevents relief. However, respondent additionally asserts that petitioner's claim fails because the OCCA found only one harmless error.

It is unnecessary to address respondent's initial contention, as the court concludes there are no errors here to "cumulate" under any theory. Respondent correctly notes that the OCCA found only one error and that was in the trial court's decision to shackle petitioner during trial contrary to state law. The OCCA ultimately determined that error to be harmless. This court has likewise found that petitioner is not entitled to relief on that claim. <u>See</u> Ground III, <u>supra</u>. Further, no other errors or grounds for relief have been established here. In these circumstances, petitioner's Ground XII affords no basis for relief. <u>See</u> <u>Hooks v. Workman</u>, 689 F.3d 1148, 1195 (10th Cir. 2012) (cumulative error analysis is required "only if there are at least two errors").

## V. Conclusion.

Having rejected petitioner's grounds for relief, his petition for a writ of habeas corpus [Doc. #25] is **DENIED**. Judgment will enter accordingly.

**IT IS SO ORDERED**.

Dated this 17th day of February, 2015.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE